UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BEAVERTAIL, INC., et al.,<br><br>     Plaintiff,<br><br>     v.<br><br>UNITED STATES OF AMERICA,<br><br>     Defendant. | Case No. 4:12-cv-610-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Before the Court is the United States' Motion to Dismiss Plaintiffs' Amended Complaint.  *See* Dkt. 42.  For the reasons explained below, the Court will deny the motion to dismiss plaintiffs' tort claims.  The Court will also deny the motion to dismiss plaintiffs' quiet title claim, though it will order plaintiffs to either: (1) join the State of Idaho as a required party under Federal Rule of Civil Procedure 19(a); or (2) make a showing as to why the quiet title claim should proceed in the State's absence.

## BACKGROUND

This lawsuit concerns Grays Lake, which is a 22,000-acre marsh in Eastern Idaho, northeast of Soda Springs.  Orestes S. John first surveyed the lake in 1877, describing it as "a shallow lake of uncertain or variable extent . . . margined by fields of tule, and

treacherous bog." *See Sibbett Dec.* ¶¶ 2, 3 & Ex. 1. The marsh was historically used by ranchers and homesteaders for haying and grazing.

Over time, tensions arose between the ranchers and the United States government. Both sides claimed ownership to the property. The government wished to use the marsh as a water storage facility for the Shoshone Bannock Tribes and for a wildlife refuge, while the ranchers wished to continue using the marsh for haying and grazing.

In 1965, to clarify uses and ameliorate tensions, various ranchers (including the plaintiffs here) and the government entered into identical 99-year *Refuge Use and Cooperative Use Agreements. See* Dkt. 23-3. The Cooperative Use Agreements provide that the government will use the middle of the lakebed – which the parties varyingly describe as a donut hole, the inner ring, or the Exempt Area – for a wildlife refuge and for water storage. As for the remaining, one-half-mile wide outer ring, the ranchers would continue to use that area for haying and grazing. *Id.*

The government also planned to build a perimeter dike enclosing the donut hole. *See* Dkt. 23-3, at 2 (fifth and ninth unnumbered "whereas" clauses); *id.* ¶ (2). The basic idea was that the water within the dike would be used for the Tribes and for waterfowl, while the dried area outside the dike would be used for continued haying and grazing.

As discussed further below, the agreements between the ranchers and the government do not obligate the government to build the perimeter dike. Instead, these agreements simply grant the government the exclusive right to construct a dike. But a few months before the ranchers entered into the Cooperative Use Agreements with the

government, the Bureau of Indian Affairs (BIA) and the Department of Sport Fisheries and Wildlife ("Fish & Wildlife"), entered into a separate Memorandum of Understanding with each other regarding the Grays Lake wildlife refuge. *See 1964 Memorandum of Understanding between BIA and Fish & Wildlife,* Dkt. 23-4; *Bloomfield Dec.* ¶ 7. That agreement states that "the Bureau of Sport Fisheries and Wildlife will, as funds become available, construct dikes, roads, canals, control structures, fences, and operational headquarters; . . . ." *1964 Memorandum of Understanding,* Dkt. 23-4, ¶ 2. This agreement also states that water levels could be manipulated at certain times, in certain pools, "PROVIDED, HOWEVER, that the . . . perimeter diking system is to be impervious." *Id.* ¶ 3.

Other documents prepared in the spring or early summer of 1965 also refer to the planned perimeter dike, including this statement in a June 16, 1965 Department of Interior news release: "Development of the Grays Lake National Wildlife Refuge will include construction of a periphery dike, water control structures, and pumping facilities." *Ex. D to Bloom Dec.*, Dkt. 23-5. *See also Ex. K to Smith Dec., May 14, 1965 Memo* (estimating costs for construction of dikes and other facilities).

The government began construction of the perimeter dike but never completed it. According to plaintiffs, the small section of the dike that was completed failed to impound the water inside the dike and also failed to dry up the area outside the dike. *See Sibbett Dec.,* Dkt. 8, ¶ 8. Regardless, the government left the partially constructed dike in place, rather than removing it. Plaintiffs say the partially constructed dike continually

exacerbates spring flooding on their properties.

The ranchers filed this action in December 2012. Shortly afterward, the Court granted the parties' motion to stay the proceedings while they attempted to settle their differences. *Mar. 13, 2013 Stay Order,* Dkt. 10. Several co-plaintiffs resolved their disputes, which included selling their lakebed properties to the government. The remaining two plaintiffs – Beavertail, Inc. and Grays Lake Land & Cattle, Inc. – have not settled. In November 2015, the Court lifted the stay, and in September 2016, the Court granted the government's motion to dismiss the complaint, with leave to amend. *See Sept. 29, 2017 Order,* Dkt. 38. Plaintiffs have now filed their amended complaint, and the government again moves to dismiss. *See* Dkts. 39, 42.

## DISCUSSION

Plaintiffs allege four claims. The first three, for negligence, negligence per se, and trespass, are brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680. The fourth is a quiet title claim, brought under the Quiet Title Act, 28 U.S.C. § 2409a(d). *See Am. Compl*. Dkt. 39.

The government contends that plaintiffs' tort claims are barred by the discretionary function exception to the FTCA. Alternatively, the government argues that the tort claims are barred by the FTCA's two-year statute of limitations and because the government has the right to possess the inner ring of the lakebed. The Court will address each argument in turn, beginning with arguments related to the FTCA's discretionary function exception.

**A. The Governments' 12(b)(1) Motion to Dismiss Plaintiffs' Tort Claims**

**1. The Governing Legal Standard**

The government raises the discretionary function exception within its Rule 12(b)(1) motion. A Rule 12(b)(1) jurisdictional attack may be facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction. The government's attack is factual, as it relies on extrinsic evidence and does not assert lack of subject-matter jurisdiction based solely on the pleadings.

In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. *Savage v. Glendale Union High Sch.,* 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003) (citing *White,* 227 F.3d at 1242). The court need not presume the truthfulness of the plaintiff's allegations. *White,* 227 F.3d at 1242. *Safe Air for Everyone*, 373 F.3d at 1039.

However, "[t]he relatively expansive standards of a 12(b)(1) motion are not appropriate for determining jurisdiction [pursuant to a "factual attack"] ... where issues of jurisdiction and substance are intertwined. A court may not resolve genuinely disputed facts where 'the question of jurisdiction is *dependent* on the resolution of factual issues going to the merits.'" *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir. 1987).

To the extent the issues become so intertwined, the summary judgment standard comes into play. Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *See id.* at 248.

The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B); *see T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex,* 477 U.S. at 322). The Court must consider "the

cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c) (3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." R. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.,* 809 F.2d at 630–31 (internal citation omitted).

Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby,* 477 U.S. at 252.

### 2. Overview of the Federal Tort Claims Act & The Discretionary Function Exception

The FTCA waives sovereign immunity, allowing tort claims to be brought against the United States arising out of the negligent conduct of government agents acting within the scope of their discretion. 28 U.S.C. § 2671-80; *Miller v. United States*, 163 F.3d 591

593 (9th Cir. 1998). Thus, the United States may be held liable "to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

Congress has carved out several exceptions to the FTCA's waiver of immunity, however. *See* 28 U.S.C. § 2680. One of those exceptions is the discretionary function exception, which provides that the FTCA's waiver of sovereign immunity does not extend to:

> Any claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

"The discretionary function exception is meant to avoid judicial second-guessing of governmental decisions. It is not, however, intended to create inconsistent liabilities between private and government employees performing identical acts. Thus, 'in cases where the government is alleged to have committed negligence in the performance of a function such as that performed by a private citizen, rather than in the fulfillment of a broad policy-making duty, the government is subject to suit.'" *Bear Medicine v. United States,* 241 F.3d 1208, 1214 (9th Cir. 2001) (quoting *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995)).

The applicability of the discretionary function exception is determined by a two-part test, sometimes referred to as the *Berkovitz* analysis. *See generally Berkovitz v. United States*, 486 U.S. 531, 536 (1995). First, the exception covers acts that are

*discretionary*, so the challenged action must be "a matter of choice for the acting

employee." *Id.* The choice requirement is not satisfied where a "federal statute,

regulation, or policy specifically prescribes a course of action for an employee to follow"

because in that case, "the employee has no rightful option but to adhere to the directive."

*Id.*

Second, if discretion is involved, there must also be a finding that the discretion

involves the type of judgment the discretionary function was designed to shield. *Id.*

The exception is designed to shield actions and decisions based on social, economic, or

political policy. *Id.* The decisions need not actually be grounded in policy

considerations, but must, by their nature, be susceptible to a policy analysis. *United

States v. Gaubert*, 499 U.S. 315, 325 (1991).

### 3. **Did the Government Deviate from a Required Duty?**

The first question, then, is whether the government deviated from a required duty.

Focusing on the initial decision to build the perimeter dike, plaintiffs argue that the

government was obligated to build the dike under the 1965 Cooperative Use Agreements.

But the agreements do not contain provisions expressly stating that the government must

build a perimeter dike. The recitals refer to a government "proposal" for development.

*See Agmt.*, Dkt. 23-3 (5th & 9th unnumbered whereas clauses). Then a later section grants

the government the "exclusive right" to manage the planned wildlife refuge "by dams,

dikes, fills, ditches, water control structures dikes, roads, fences, the removal of earth or

vegetation, or other suitable construction methods, . . . ." *Id.* ¶ (2).[1]  So although the

agreements demonstrate that the government was indeed proposing to build a dike, they

stop short of obligating the government to do so.

Likewise, the agreements do not expressly require the government to remove the

partially built dike.  They are silent on that specific point, but paragraph 10 of the

agreements states:  "Any structures or fixtures placed upon or attached to the lands lying

in the Area by the Government during the term of this Agreement shall be and remain the

property of the United States and may be removed therefrom by the Government prior to

its termination or within 180 days thereafter." *Id.* ¶ (10).

Given these contract terms, the Court is not persuaded by the plaintiffs' argument

that the Cooperative Use Agreements obligated the government to complete construction

of the perimeter dike.  Accordingly, based on the arguments before it, the Court

concludes that the government prevails at step one of the *Berkovitz* analysis.

Before moving to step two, however, the Court will pause to observe that in the

earlier, 1964 agreement between the BIA and Fish & Wildlife (which pre-dates the

Cooperative Use Agreements), Fish & Wildlife agreed to construct a dike as funds were

---

[1] In relevant part, paragraph (2) provides:  "The First Parties [individual landowners] agree to the use by the Government of the exempt portion of the Area, for the term of this Agreement, for the construction, operation and maintenance of a National Wildlife Refuge, . . ; and such use shall include the exclusive right of the Government to maintain a body of water in said exempted portion of the Area and to manage that body of water by dams, dikes, fills, ditches, water control structures, roads, fences, the removal of earth or vegetation, or other suitable construction methods, so that the Government can develop a wildlife refuge for migratory birds and other wildlife purposes, . . . ." *Agmt.*, Dkt. 23-3, ¶ (2).

made available.  *See 1964 Memorandum of Understanding between BIA and Fish &*
*Wildlife,* Dkt. 23-4; *Bloomfield Dec.* ¶ 7.  Several courts, including the Ninth Circuit,
have recognized that if the government voluntarily assumes a contractual obligation, that
obligation may impose nondiscretionary duties on government employees.  *See, e.g.,*
*Routh v. United States,* 941 F.2d 853, 855 (9th Cir. 1991) ("discretion may be removed if
the government incorporates specific safety standards in a contract which imposes duties
on the government's agent" (internal quotation omitted)); *Bell v. United States,* 127 F.3d
1226, 1230 (10th Cir. 1997) (finding that contract specifications left no discretion); *Kiehn*
*v. United States,* 984 F.2d 1100, 1106 (10th Cir. 1993) (mandatory emergency assistance
required by contract and National Park Service Guidelines); *Feyers v. United States,* 749
F.2d 1222, 1227 n.7 (6th Cir. 1984) (considering whether contract required specific
safety measures).

     In *Bell v. United States*, 127 F.3d 1226, 1230 (10th Cir. 1997), for example, the
Tenth Circuit held that a government agency removed its discretion *not* to remove a
pipeline during dam-related construction because it had it had contractually agreed to
remove that pipeline.  In that case, the United States Bureau of Reclamation provided
engineering services to a New Mexico State commission related to installing spillway
gates on an existing dam.  *Id.* at 1227.  The Bureau also agreed to supervise the work so
that it was done according to its specifications.  *Id.*  The specifications called for a
pipeline to be removed, but, during construction, the project engineer allowed the
pipeline to remain in place.  *Id.* at 1228.

After the project was completed, a fourteen-year-old boy dove into the reservoir, hit his head on the submerged dirt embankment covering the pipeline, and was severely injured. *Id.* at 1227. The Tenth Circuit concluded that the discretionary function exception did not immunize the government's conduct because when the Bureau voluntarily assumed a contractual duty to ensure removal of the pipeline, it removed its discretion *not* to remove the pipeline. *Id.* at 1230. Thus, "'there [was] no discretion . . . for the discretionary function exception to protect." *Id.* (citing *Berkovitz*, 486 U.S. at 536).

Plaintiffs might argue that under the logic of cases such as *Bell*, Fish & Wildlife voluntarily assumed a contractual duty to construct dikes as funds became available and, as such, removed the government's discretion *not* to construct the planned perimeter dike as funds became available. But plaintiffs have not raised this argument, so the government has not had a chance to brief the issue. Nor have plaintiffs directly addressed the government's reliance on a regulation (promulgated in 2008) stating that a different government agency (the BIA) ""may build, operate, maintain, rehabilitate or remove structures . . . on our irrigation projects." 25 C.F.R. 171.400.

Under these circumstances, and based on the arguments advanced in the briefing, the Court will stick with the conclusion stated above – namely, that the government had discretion in deciding whether to build the perimeter dike. More specifically, the Court concludes that the Cooperative Use Agreements did not obligate the government to build the dike. The Court expresses no opinion at this time regarding whether the 1964

Agreement removed the government's discretion *not* to build the perimeter dike.  If plaintiffs wish to obtain an opinion on that narrow issue, they may request reconsideration of this portion of the Court's decision.

The government has thus prevailed at step one of the *Berkovitz* analysis.  As explained in the next section, however, the plaintiffs prevail at the second step because even though the government had discretion to decide whether to complete the dike, the government's decisions to stop construction and leave the partially built dike in place are not the sort of policy-based decisions the discretionary function exception is designed to protect.

### 4.   Were the Government's Actions Grounded in Policy Considerations?

At step two, the question is whether the decisions at issue are "susceptible to a policy analysis grounded in social, economic, or political concerns." *Miller v. United States,* 163 F.3d 591, 595 (9th Cir. 1998) (citing *Gaubert*, 499 U.S. at 325).  To be protected, the decisions should be "fraught . . . with public policy considerations." *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) (internal quotations marks omitted; as quoted in *O'Toole v. United States*, 295 F.3d 1029, 1034 (9th Cir. 2002)).

Many courts have observed how difficult it is to apply this part of the test.  The Ninth Circuit, for example, has "remarked upon the difficulty of charting a clear path through the weaving lines of precedent regarding what decisions are susceptible to social, economic, or political policy analysis." *Whisnant v. United States*, 400 F.3d 1177, 1181

(9th Cir. 2005) (citing *O'Toole*, 295 F.3d at 1035).[2] And the Supreme Court has admitted

that its reading of the discretionary function exception "has not followed a straight

line . . . . ." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig*

*Airlines)*, 467 U.S. 797, 811 (1984).

Still, though, in *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005), the

Ninth Circuit identified two trends in its case law:

> First, a dominant theme in our case law is the need to distinguish between
> design and implementation: we have generally held that the *design* of a
> course of governmental action is shielded by the discretionary function
> exception, whereas the *implementation* of that course of action is not.[3]
> Second, and relatedly, matters of scientific and professional judgment –
> particularly judgments concerning safety – are rarely considered to be
> susceptible to social, economic, or political policy.

*Id.* at 1181 (emphasis and footnote in original). The Ninth Circuit went on to observe the

following illustrations of these trends:

> Thus, for example, in a suit alleging government negligence in the design

---

[2] Many courts have made similar observations. *See, e.g., Terbush v. United States,* 516 F.3d
1125, 1129 (9th Cir. 2008) ("The distinction between protected and unprotected actions and decisions has
proven itself to be a particularly vexing determination for district and appellate courts alike."); *O'Toole v.
United States,* 295 F.3d 1029, 1035 (9th Cir. 2002) ("As has been noted by numerous courts, reconciling
conflicting case law in this area can be difficult," (citing *United States v. S.A. Empresa de Viacao Aerea
Rio Grandense (Varig Airlines),* 467 U.S. 797, 811-12 (1984) (noting that "the Court's reading of the
[FTCA] has admittedly not followed a straight line") *and Shansky v. United States*, 164 F.3d 688, 693 (1st
Cir. 1999) (observing that the "case-by-case approach" of this second prong "has led to some disarray,"
and citing cases whose holdings are in direct conflict)).

[3] The design/implementation distinction should be differentiated from the operational/planning
distinction rejected in *Gaubert*: the former concerns the nature of the decision, while the latter concerns
the identity of the decisionmaker. *Cf. Gaubert*, 499 U.S. at 325 ("It is the nature of the conduct, rather
than the status of the actor, that governs whether the discretionary function exception applies in a given
case." (citation, internal quotation marks, and alteration omitted)). There is nothing to prevent a low-level
government official from selecting a course of action or a higher-level official from implementing one.

and maintenance of a national park road, we held that designing the road without guardrails was a choice grounded in policy considerations and was therefore shielded under the discretionary function exception, but maintaining the road was a safety responsibility not susceptible to policy analysis. *See ARA Leisure Servs. v. United States,* 831 F.2d 193, 195 (9th Cir. 1987). Similarly, in a suit alleging government negligence in the design and construction of an irrigation canal, we held that the decision not to line the canal with concrete was susceptible to policy analysis, but the failure to remove unsuitable materials during construction was not. *See Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1027–28, 1031 (9th Cir. 1989).

*Id.* at 1181-82.

Here, the government says there are two acts at issue: "[1] the United States' failure to complete the water containment system and [2] its failure to remove the partially-constructed structure." *Motion Mem.*, Dkt. 42-1, at 5. These two acts should be placed in the larger context, however. The record reflects that the government: (1) decided to create a wildlife refuge and a water storage facility at Grays Lake; (2) selected from a variety of construction methods, including the possibility of constructing of a perimeter dike, to manage the wildlife refuge and water storage facility; (3) settled upon a perimeter dike as one of the methods of choice; (4) entered into an inter-agency memorandum of understanding stating that Fish & Wildlife "will, as funds become available, construct dikes, . . . .";[4] (5) entered into the Cooperative Use Agreements with

_____

[4] *1964 Memorandum of Understanding,* Dkt. 23-4, ¶ 2. As noted above, the Court expresses no opinion regarding whether this agreement removed the government's discretion *not* to build the perimeter dike.

the landowners; (6) started building the perimeter dike; (7) stopped building the dike; and (8) left the partially constructed dike in place.

The government's decision to create a wildlife refuge and water storage facility, as well as its decision to construct a diking system to further that goal, are the sorts of policy decisions the discretionary function is intended to protect. But the issue becomes more difficult when examining the government's decision to stop construction and then its later decision to leave the partially constructed dike in place. Plaintiffs argue that these later decisions, and, in particular, the decision to stop construction, were not broad policy decisions, but, instead, were decisions based on technical or scientific considerations.

The Court agrees with plaintiffs. On the record before the Court, the decision to stop construction was a failure to effectuate a policy decision already made, or a decision to stop due to technical reasons, rather than a policy-based decision that designed a governmental course of action.

The next question is whether leaving the failed, partially constructed dike in place reflects a policy decision. As with the decision to stop construction, this decision was a failure to effectuate a policy choice that had already been made, rather than a policy-based decision that designed a course of action. As already noted, the Ninth Circuit has held that "'a failure to effectuate policy choices already made' will not be protected under the discretionary function exception." *Bear Medicine*, 241 F.3d at 1215 (quoting *Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287, 290 (9th Cir. 1989)). In some ways, this decision is similar to the decisions made in *Kennewick,* where a break

in an irrigation canal was at issue. There, the court held that the canal's *design* was protected from liability but the actual construction was based not on policy, but rather on technical considerations, and therefore not subject to the discretionary function exception. *Kennewick*, 880 F.2d 1018, 1029 (9th Cir. 1989).

Cases involving alleged failures to maintain are also instructive here. *See, e.g., Terbush v. United States*, 516 F.3d 1125, 1134 (9th Cir. 2008); *O'Toole v. United States,* 295 F.3d 1029, 1035 (9th Cir. 2002). Granted, the government's decision to leave a failed dike in place does not present a traditional maintenance question because the plaintiffs are not alleging that the government failed to maintain the dikes. And even if they were, maintenance activities "can involve more than initially meets the eye." *Terbush v. United States*, 516 F.3d 1125, 1134 (9th Cir. 2008). For example, if maintaining a government facility or structure "involve[s] a balancing of policy considerations, more complex decisions, or outright replacement [of a facility]," *id.*, these sorts of decisions might tend to implicate broader policy considerations.

Still, though, there are some similarities between the government's failure to maintain something, and the government's decision to walk away from a partially built structure. In both cases, the government decided to ignore an underlying project or structure. In *O'Toole v. United States,* 295 F.3d 1029, 1035 (9th Cir. 2002), for example, the government undertook an irrigation project and then later decided not to maintain the irrigation ditches due to lack of funding – to the detriment of adjoining property owners. Here, the government undertook to build the perimeter dike, but then decided it couldn't

build the project due to the marshy conditions and lack of money. In both cases, the

adjoining landowners suffered the consequences of the government's decision not to act.

The *O'Toole* Court explained that

> the BIA's decision to allow the irrigation system on Bowler Ranch to
> fall into disrepair to the detriment of neighboring landowners does not
> fall within the protection of the discretionary function exception to the
> FTCA. It is less like an FDA decision not to approve a drug for sale, or
> a National Park Service decision not to put up a guardrail that will block
> visitors' views, than like a government employee's negligent driving. It
> was not a decision "susceptible to policy analysis," or "grounded in
> social, economic, and political policy, . . . "

*Id.* at 1037 (internal citations omitted).

The record in this case does not support the notion that the government's decision

to walk away from the partially constructed dike was a policy-based decision. Rather, it

was more akin to failing to maintain a ditch, or failing to remove unsuitable materials

during construction of a canal. *See, e.g., Whisnant*, 400 F.3d at 1184 ("This pattern of

conduct most closely parallels "the type of budget-shirking of safe maintenance to which

the *ARA Leisure-O'Toole* line of cases emphatically denies protection under the

discretionary function exception, and at worst constitutes simple carelessness."). Put

differently, it was not a decision that is fraught with policy considerations.

The government now says that its decision to leave the partially constructed dikes

in place helps maintain the water storage facility and the wildlife refuge and is therefore a

"policy based" decision. The government also says that the BIA has statutory discretion

to remove dams, so it is entitled to the presumption that this is a policy-based decision.

The Court is not convinced. As explained in *Terbush,* "there still must be some support in the record that the decisions taken are 'susceptible' to policy analysis for the discretionary function exception to apply. On this point, the government bears the burden. It is not sufficient for the government merely to waive [sic] the flag of policy as a cover for anything and everything it does that is discretionary in nature." . . . Indeed, it all that were required were a bald incantation of 'policy,' then such an approach would swallow the second prong of *Berkovitz.*" *Terbush v. United States,* 516 F.3d 1125, 1134 (9th Cir. 2008).

For all these reasons, the Court will deny the government's Rule 12(b)(1) motion to dismiss plaintiffs' tort claims based on the discretionary-function exception.

## III.    The Government's Rule 12(b)(6) Motion

The Court will also deny the government's Rule 12(b)(6) motion to dismiss the tort claims.

### A.    The Governing Legal Standard – Rule 12(b)(6)

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The scope of review on a motion to dismiss for failure to state a claim is limited to "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007).

**B.      The Statute of Limitations – Claims Related to the Outer Ring**

A two-year statute of limitations governs claims brought under the FTCA.  *See* 28 U.S.C. § 2401(b).  Federal law determines when an FTCA claim accrues, *see Bartleson v. United States*, 96 F.3d 1270, 1276 (9th Cir. 1996), but state law determines the nature of the underlying claim and further "governs application of the [FTCA's] two-year statute of limitations."  *Arcade Water Dist. v. United States,* 940 F.2d 1265, 1267 (9th Cir. 1991). This is so because the FTCA "dictates that state law determines federal government liability."  *Id.* (citing *Taylor v. United States,* 821 F.2d 1428, 1430 (9th Cir. 1987)). Accordingly, the Court must consult Idaho state law to determine the nature of plaintiffs' claim.  *Id.*

As noted, plaintiffs allege three tort claims: trespass, negligence, and negligence per se.  Plaintiffs say they have alleged continuing torts because of the repeated annual flooding onto their properties.  The government, on the other hand, says there is just one allegedly tortious act:  the government's decision to leave the partially constructed dikes in place.  Viewing that isolated event as the single tortious act, the government argues that plaintiffs' claims are time barred.  The Court is not persuaded.

Idaho courts recognize the continuing-tort doctrine, though they apply it differently, depending on the factual context.  *See Curtis v. Firth,* 850 P.2d 749, 754 (Idaho 1993) ("Our task in the instant case is to determine which, if any of those interpretations [of the continuing-tort theory] apply here.").

In *Woodland v. Lyon*, 298 P.2d 380, 382 (Idaho 1956), the Idaho Supreme Court

interpreted the continuing-tort doctrine in a factual setting closely paralleling this case.

In *Woodland*, a downstream landowner sued his upstream neighbor, alleging that the

neighbor had "filed in" a streambed on his property in 1949, which prevented plaintiff

from getting sufficient water during four later irrigating seasons (1950-53). The Idaho

Supreme Court characterized this as a continuing tort, even though the defendant

arguably performed a single act in 1949, when he filed in the streambed. The court

explained that "[t]he tort alleged herein is not a single wrong, but a continuing one, and

appellant may, if the evidence supports his claim, recover for all injuries occurring within

the statutory period, even though the obstruction occurred more than four years before the

complaint was filed." *Id.* at 382.

Under *Woodland,* plaintiffs may proceed on a continuing tort theory and their

claims are not barred by the FTCA's two-year limitations period, although any damages

awarded will be limited to the two-year period before plaintiffs filed their administrative

claim.

### C.      The Government's Right to Possess the Property – Claims Related to the Exempt Area

The government next argues that the tort claims should be dismissed under Rule

12(b)(6) because the Cooperative Use Agreements allow the government to possess a

portion of plaintiffs' property – namely, the property stretching from the center of the

lake to approximately one half mile below the meander line, *i.e.,* the inner ring, donut

hole, or "Exempt Area." But if the government conducts tortious activities on the

property, it cannot shield itself from liability for its negligent conduct simply by claiming

that it had a contractual right to possess that property. *See Herbst v. Bothof Dairies, Inc.*, 719 P.2d 1231, 1234 (Ct. App. Idaho 1986) (discussing the coalescence of contract and tort duties, observing that a contractual obligation to provide adequate care of livestock was "coextensive with . . . [the defendant's] duty in tort to exercise reasonable care concerning property entrusted to its possession."). The Court will therefore deny the motion to dismiss the negligence claims related to the Exempt Area.

Likewise, the Court will deny the Rule 12(b)(6) motion to dismiss the trespass claim. Here, the government is not arguing that its contractual right to possess the Exempt Area completely bars plaintiffs' trespass claim. Rather, the government argues that this right prevents plaintiffs from asserting a trespass claim *related to the inner ring of the lakebed, i.e.* the "Exempt Area." *See Motion Mem.,* Dkt. 42-1, at 11 (asserting that claims related to the "'Exempt Area' fail because the United States has a right to possess Plaintiff's property"). The government points out that under the Cooperative Use Agreements, it was entitled to build the dikes, and, further, to leave those dikes in place. In a nutshell, then, the government is essentially asserting that plaintiffs consented to the alleged trespass. This may be true, but plaintiffs appear to be alleging that the presence of the partially built dikes resulted in *exacerbated* flooding of the property, *see First Am. Compl.*, Dkt. 39, ¶ 90 (alleging that by failing to remove the dikes, "the United States has caused exacerbated periodic flooding of portions of the Property which results in a trespassory invasion of the Ranchers' property rights each time the periodic flooding occurs."). Thus, plaintiffs may proceed with their trespass claim related to the inner ring

based on the notion that they did not concede to this particular type of trespassory

invasion. *See Mortkowitz v. Texaco Inc.,* 842 F. Supp. 1232, 1242 (N.D. Cal. 1994)

(allowing a trespass claim to proceed, observing that despite generally consenting to

Texaco's use of property as a service station, the landlord did not specifically consent to

Texaco's use of a leaking pipeline).

## III.    The Quiet Title Claim

Finally, the Court turns to the quiet title claim.  This claim deals with pie-slice-

shaped pieces of property within the bed of Grays Lake. Specifically, plaintiffs focus on

"certain parcels of real property in Grays Lake extending from the center of the lake to

the meander line (hereinafter the "Property"), the line that separates the historical

lakebed from the uplands." *Am. Compl.*, Dkt. 39, ¶48; *see also id.* ¶¶ 99-100, 104.  The

government contends that the quiet title claim should be dismissed under Rule 12(b)(7)

because the State of Idaho and certain other individuals are required parties under

Federal Rule of Civil Procedure 19(a) and indispensable parties under Rule 19(b).[5]

The Court will deny the government's motion to dismiss the plaintiffs' quiet title

claim for misjoinder, though it will order plaintiffs to name the State of Idaho as a party

to this lawsuit, *see* Fed. R. Civ. P. 19(a)(2), or, alternatively, if the plaintiffs cannot

_____

[5] Rule 19 no longer refers to "necessary" and "indispensable" parties.  Instead, for stylistic purposes only, the rule now refers to "persons required to be joined if feasible" and persons in whose absence, if they cannot be joined, the action should not proceed.  *See* Fed. R. Civ. P. 19 advisory comm. nt. (2007).  Still, though, many courts continue to use the terms "necessary" and "indispensable" and the phrases are used from time to time in this opinion as well.

feasibly join the State, they may attempt to make a showing that the action should proceed in the State's absence in accordance with the factors set forth in Federal Rule of Civil Procedure 19(b)(1) through (4).

Rule 19 mandates a three-part inquiry to determine whether an action should be dismissed for failure to join an indispensable party. *See, e.g., E.E.O.C. v. Peabody W. Coal Co.,* 610 F.3d 1070, 1078 (9th Cir. 2010). "First, the court must determine whether a nonparty should be joined under Rule 19(a)." *Id.* If an absentee meets the requirements of Rule 19(a), "the second stage is for the court to determine whether it is feasible to order that the absentee be joined." *Id.* Finally, if joinder is not feasible, the court must determine at the third stage whether the case can proceed without the absentee or whether the action must be dismissed. *Id.* A nonparty in whose absence an action must be dismissed is one who "not only [has] an interest in the controversy, but [has] an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." *Shields v. Barrow,* 58 U.S. 130, 139 (1855).

### 1. Rule 19(a) – Required Party

The first question is whether the State of Idaho and other private landowners are "required" parties under Rule 19(a)(1). An absent party is "required" in two alternative instances under sub-section (a)(1). The first is when a court cannot accord complete relief among the existing parties because of the absent party. *See* Fed. R. Civ. P. 19(a)(1)(A).

The second is when the absent party claims an interest in the subject of the action that is of such a character that disposing of the action would either impair or impede the absent person's ability to protect its interest as a practical matter, or would leave an existing party in substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the absent person's interest. Fed. R. Civ. P. 19(a)(1)(B)(i) and (ii).

### a. The State of Idaho

Here, the State of Idaho is a required party under the sub-paragraph (a)(1), because even assuming the Court could accord "complete relief" among the existing parties, the State of Idaho nevertheless continues to claim an ownership interest in the entire lakebed. *See generally Pit River Home & Agric. Coop. Ass'n v. United States,* 30 F.3d 1088, 1099 (9th Cir. 1994). .

The parties apparently agree that either the State of Idaho or the private landowners have title to the lakebed, and that the dispositive issue is whether the lake was navigable at the time of statehood. If the lake was navigable at the time, the State of Idaho has title, and if not, the private landowners have title. So the problem for the federal government, is that the plaintiffs might well prevail here, but the State of Idaho would not be bound by such a judgment, and could later litigate, and possibly prevail, upon the issue, creating inconsistent judgments as well as making the federal government potentially liable to both the State and the plaintiffs here. Thus, if this Court were to resolve the title claim to a portion of the lakebed in the State's absence, the United States could be "subject[ed] to a substantial risk of incurring double, multiple, or otherwise

inconsistent obligations because of the [State's] interest." Fed. R. Civ. P. 19(a)(1)(B)(ii). This is so because the United States is currently using the lakebed with permission from the State, but without permission from the plaintiffs. Unless the title dispute between the State of Idaho and the plaintiffs is resolved, the United States could theoretically be in a position where it must obtain consent from both plaintiffs and the State of Idaho to use the lakebed.

Plaintiffs argue that the State is not a "required" party under Rule 19(a) because Idaho has not sought to intervene in this litigation, and, further, the State has said it is not interested in litigating title. The plaintiffs support this argument by citing a January 2014 letter authored by the State Attorney General's office, and this letter does indeed say that the State is not interested in title suit relating to the bed of Grays Lake. But the State's position is more nuanced than that. The letter outlines a settlement agreement between the State of Idaho and the United States regarding the use of Grays Lake as a storage reservoir and a wildlife refuge. *See Letter from Clive Strong to Stanley Sparks and Robyn Thorson*, Dkt. 42-8, at 1. The letter explains the State's position, and its agreement with the federal government, as follows:

> The United States' use of the lake bed has been a point of contention with adjacent land owners since the 1920s. As you know, the dispute centers on whether the upland owners are entitled to compensation from the United States for use of the lake bed. The answer to this question turns on whether Grays Lake was navigable when Idaho was admitted to the Union. If it was, Idaho holds title to the lake bed under the equal footing doctrine and its consent to the United States' use of the lake bed would be required; if it was not, then the adjacent land owners each own a proportionate share of the lake bed, and are entitled to compensation from the United States. Rather than engage in a lengthy and costly litigation to resolve the title

issue, we have agreed to finesse the issue. The United States will acquire the interest, if any, of the land owners, and the State will consent to the United States' use of the lake bed for a storage reservoir and a refuge. ***Under the agreed upon resolution the State of Idaho will retain its claim to ownership of the bed of Grays Lake.*** This solution will ensure, however, that the United States has permission for the use of the lake bed from the two potential owners.

*Id.* (emphasis added).

As shown by the emphasized language, although the State agreed to finesse the title issue via this settlement agreement, it did not agree to abandon its claimed ownership interest in the lakebed. To the contrary, it crafted the agreement so that it would retain its claimed ownership to the lakebed. Under these circumstances, the Court concludes that – despite the January 2014 settlement agreement – the State of Idaho is a "required" party under Rule 19(a).

### b. Other Landowners

The Court is not convinced that the other two landowners the government identifies are required parties under Rule 19(a). As plaintiffs point out, the government has not demonstrated that these landowners claim ownership to the same portion of the lakebed plaintiffs claim to own. Further, the Grays Lake Private Ownership map provided by plaintiffs indicates that these landowners' properties are not even adjacent plaintiffs' properties, so these landowners logically would claim entirely different portions of the lakebed in any event. *See Sibbett Dec.* ¶ 14 (describing the real property subject to this litigation); *Grays Lake Private Ownership Map,* Dkt. 27-8. In other words, these other landowners are not making any claim to the property at issue in this lawsuit.

Accordingly, even in these landowners' absence, the Court may accord complete relief among the existing parties. *Fed. R. Civ. P.* 19(a)(1)(A). Similarly, there is no evidence that disposing of this action in these landowners' absence might, as a practical matter impair their ability to protect their interest or leave an existing party subject to a substantial risk of incurring multiple or inconsistent obligations.[6]

### 2. Rule 19(b): Indispensable Party

The next question is whether it is feasible for the State of Idaho to be joined as a defendant. Neither side briefed this point. The government dropped a footnote stating that it "takes no position on whether the State can be joined, but notes that the State may be immune from quiet title actions under the Eleventh Amendment." *Motion Mem.*, Dkt. 42-1, at 19 (citing *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 281-82 (1997)).

Plaintiffs argue that by taking no position on this issue, the government failed to carry its burden of proof, and, therefore, this Court should deny the motion without further analysis. Plaintiffs also say that, regardless, "there are methods of joining state actors, including by consent, that do not run afoul of the Eleventh Amendment." *Response*, Dkt. 48, at 18 n.4.

The problem with the parties' approach is that the Court should not proceed to the

---

[6] This conclusion could theoretically change when and if the State of Idaho is joined in this action. If the State claims an interest in the entire lakebed – as opposed to the portions of the lakebed plaintiffs claim – then perhaps these landowners would be required parties. However, that is another question for another day. At this point, plaintiffs have not named the State of Idaho as a defendant, and it remains to be seen whether it is feasible to join the State in this action.

third and final step of the analysis unless it determines that the absent party cannot be joined. *See, e.g., E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005) ("*if joinder is not feasible*, the court must determine at the third stage whether the case can proceed without the absentee, or whether the absentee is an "indispensable party" such that the action must be dismissed") (emphasis added).

Accordingly, at this point, the logical course of action is to require the plaintiffs to either join the State of Idaho or make a showing as to why this action should proceed in the State's absence under Rule 19(b).

The Court will note that if it is not feasible for the State to be joined, the Court would likely dismiss the quiet title action because the State is "indispensable" under Rule 19(b). Obviously, this is not the preferred outcome, as courts are generally reluctant to dismiss actions for nonjoinder. *See, e.g., Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 918 (4th Cir. 1999) (dismissal for nonjoinder is a "drastic remedy . . . which should be employed only sparingly."). However, if plaintiffs wish to pursue this quiet title action, it seems likely that they would be able to do so in state court. *See generally Sanitation Dist. No. 2 of L.A. Cnty. v. Inland Container Corp.*, 803 F.2d 1074, 1077-78 (9th Cir. 1986) (if an action is dismissed for failure to join an indispensable party, the plaintiff is not precluded from pursuing a claim against that party in a subsequent action). Eleventh Amendment immunity does not apply in state court, *see Hilton v. S.C. Public Rwys. Comm'n*, 502 U.S. 197, 205 (1991), and the state court may be better situated to entertain a real property action than a federal court. *See*

*generally* 7 Fed. Prac. & Proc. Civ. § 1621 (3d ed.).

## ORDER

**IT IS ORDERED that:**

1. The United States' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint (Dkt. 42) is **DENIED.**

2. Plaintiffs shall join the State of Idaho as a required party within 30 days of this Order. Alternatively, within 30 days of this Order, plaintiffs may attempt to make a showing under Federal Rule of Civil Procedure 19(b).

3. The United States' unopposed request for judicial notice of certain court filings in this matter, *see* Dkt. 42-1, at 11 n.1, is **GRANTED.**

DATED: August 29, 2017

B. Lynn Winmill
Chief Judge
United States District Court