UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BEAVERTAIL, INC., et al.,<br><br>      Plaintiff,<br><br>      v.<br><br>UNITED STATES OF AMERICA,<br><br>      Defendant. | Case No. 4:12-cv-610-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Before the Court is Plaintiffs' Motion to Reconsider (Dkt. 59). Plaintiffs ask the Court to allow their quiet title action to proceed in the State of Idaho's absence, even though Idaho claims an interest in the same property plaintiffs claim to own. Plaintiffs also ask the Court to rule in their favor on a narrow issue related to their tort claims. For the reasons explained below, the Court will grant both requests.

## BACKGROUND

The parties are familiar with the facts and procedural history of this lawsuit.[1] Briefly, however, this action concerns Grays Lake, which is actually a 22,000-acre marsh

---

[1] A more detailed factual recitation is found in the Court's August 29, 2017 decision. *See* Dkt. 54.

in eastern Idaho. Title to the lakebed is disputed; over the years, various ranchers, the State of Idaho, and the United States have claimed ownership of the lakebed. The federal government is currently using the marsh as a wildlife refuge and water storage facility.

The plaintiffs contend that the United States damaged their properties by failing to remove a partially constructed dike on the lakebed. The government began building this dike back in the 1960s, but then stopped construction and left the partially constructed dike in place. The ranchers allege that the dike exacerbates seasonal flooding on their properties. *See, e.g., Am. Compl.,* Dkt. 39, ¶¶ 4, 6, 48, 90. The ranchers also ask the Court to quiet title to them in a portion of the lakebed.[2] *See id.* ¶¶ 94-104.

In an earlier order, the Court granted the government's motion to dismiss because it appeared plaintiffs were attempting to pursue contract claims, which must be pursued in the Federal Court of Claims. *See Sept. 29, 2016 Order,* Dkt. 38. Plaintiffs then amended their complaint to allege tort claims and a quiet title claim. The government again moved to dismiss, arguing that the tort claims were barred by discretionary function exception to the Federal Tort Claims Act. Additionally, the government said the ranchers' quiet title claim should be dismissed for failure to join the State of Idaho and other landowners. The Court denied the government's motion to dismiss the tort claims but ordered the ranchers to either join the State of Idaho or make a showing under Federal Rule of Procedure 19(b) as to why their quiet title action should proceed in the State's

---

[2] Specifically, plaintiffs allege that they are the rightful owners of portions of the lakebed extending from the borders of their upland properties to the center of Grays Lake. *See Am. Comp.*, Dkt. 39, ¶ 99.

absence.  *See Aug. 29, 2017 Order,* Dkt. 54, at 29.  The ranchers responded with the

pending motion, arguing that this action should proceed in the State's absence.  The

plaintiffs also ask the Court to rule on a narrow issue related to their tort claims.

## DISCUSSION

### A.    The Quiet Title Claim

The Court will begin with the quiet title claim.  Federal Rule of Civil Procedure

mandates a three-step procedure for determining whether an action must be dismissed for

failure to join an indispensable party.  *See, e.g., EEOC v. Peabody W. Coal Co.,* 610 F.3d

1070, 1078 (9th Cir. 2010). First, the court determines whether the absent party is

"required" for the litigation according to the factors enumerated in Rule 19(a).  Second,

the court determines whether it is feasible to join the absent party.  Finally, if joinder is

not feasible, the Court must determine whether the action can nevertheless proceed in

"equity and good conscience" under Rule 19(b).

### 1.   Step One:  Idaho is a Required Party

The Court completed the first step of this analysis in an earlier order, concluding

that the State of Idaho is a required party under Rule 19(a).  *See* Dkt. 54, at 24-27.

### 2.   Step Two:  Joinder is Not Feasible

The next step is to decide whether it is feasible for the plaintiffs to join the State of

Idaho.  The government concedes that the State of Idaho is likely immune from suit in

federal court under the Eleventh Amendment, but says plaintiffs should at least try to join

the State because the State might decide to waive its immunity.  *Response,* Dkt. 61, at 2-

3; *see also Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 265-66 (1997).

Generally speaking, "[a] state waives its Eleventh Amendment immunity if it 'unequivocally evidence[s its] intention to subject itself to the jurisdiction of the federal court.'" *Johnson v. Rancho Santiago Community College Dist.,* 623 F.3d 1011, 1021 (9th Cir. 2010) (*citing Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 758 (9th Cir. 1999)). Here, the is no indication that the State of Idaho intends to subject itself to the jurisdiction of the federal court. To the contrary, the State has previously indicated it has no interest in litigating the title to Grays Lake, *see Jan. 24, 2014 Letter from Clive Strong to Stanley Speaks and Robyn Thorson,* Dkt. 42-8, and it has not otherwise consented to be sued.

Under these circumstances, the Court will not force plaintiffs to go through the exercise of suing the State to find out if the State has changed its mind. Instead, the Court concludes that for Rule 19(b) purposes it is not feasible for plaintiffs to join the State of Idaho as a defendant. *Cf. Long v. Area Manager, Bureau of Reclamation*, 236 F.3d 910, 917 (8th Cir. 2002) (raising the state's lack of consent sua sponte, determining that "[s]ince the state of South Dakota has not consented to this lawsuit, the eleventh amendment prevents us from asserting jurisdiction over a claim against the state").

**3. Step 3: This Action Should Proceed in Idaho's Absence**

The third and final step in the Rule 19 analysis is to determine whether "in equity and good conscience" the action should proceed in the State of Idaho's absence or whether the quiet title action should be dismissed. The Court considers four nonexclusive factors in deciding this question:

(1)    the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2)    the extent to which any prejudice could be lessened or avoided by:

        (A) protective provisions in the judgment;
        (B) shaping the relief; or
        (C) other measures;

(3)    whether a judgment rendered in the person's absence would be adequate; and

(4)    whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). The rule does not specify the weight be given to each factor. "This must be determined by the court in terms of the facts of a given case and in light of the governing equity-and-good-conscience test." *Charles Alan Wright, Arthur R. Miller et al.*, 7 Fed. Prac. & Proc. Civ. § 1608 (3d ed.)

### a) Whether Plaintiffs Would Have an Adequate Remedy if this Case Were Dismissed for Nonjoinder

In this case, the Court finds the fourth factor – whether plaintiffs have an adequate remedy if the action were dismissed for nonjoinder – to be particularly compelling.

In an earlier order, the Court indicated that if it dismissed this action for nonjoinder, plaintiffs might be able to pursue their quiet title claim in state court. *See Aug. 29, 2017 Order,* Dkt. 54, at 29. But the federal government has since clarified that if plaintiffs sue Idaho and the United States in state court, the federal government will exercise its right to remove the action to federal court. *See generally McClellan v. Kimball,* 623 F.2d 83, 86 (9th Cir. 1980) ("A state court does not have jurisdiction to decide quiet title actions against the United States."). So if plaintiffs were to attempt to

sue both sovereigns in state court, they would ultimately find themselves precisely where they are right now:  attempting to sue the State of Idaho in federal court notwithstanding the Eleventh Amendment.  Thus, if this action is dismissed, plaintiffs will not be able to "*sue effectively* in another forum where better joinder would be possible.'" Fed. R. Civ. P. 19 (Advisory Committee's Note on the 1966 Revision of Rule 19) (emphasis added).

The government suggests that the Court need not be concerned with plaintiffs' ability to obtain a remedy because plaintiffs' joinder problems arise in the context of sovereign immunity.  *See Response,* Dkt. 61, at 8.  The Court is not persuaded because at bottom plaintiffs have a jurisdictional problem, not an immunity problem. The federal government has waived its immunity from suit for quiet title.  *See* 28 U.S.C. § 2410(a)(1); *State of Alaska v. Babbitt*, 182 F.3d 672, 675 (9th Cir. 1999) (Subject to an exception not applicable here, "[t]he Quiet Title Act waives sovereign immunity subject . . . .").  And state sovereign immunity does not bar plaintiffs from seeking to quiet title to lands the State also claims to own.  *See Lyon v. Idaho*, 283 P.2d 1105, 1106 (Idaho 1955) (in a quiet title action, the plaintiffs "are asserting no claim against the sovereignty, but are attempting to retain what they allegedly own"); *accord Welch v. Maine*, 853 A.2d 214, 217 (Me. 2004) ("To allow the State to assert sovereign immunity as a bar to quiet title actions brought in its own courts by private citizens would fly in the face of the constitutional protections and property rights of the people.").  So this is not a situation where the plaintiffs are unable to obtain relief from their sovereigns due to immunity; it's just a matter of whether they are empowered to bring both sovereigns into the same court in a single action.  They are not.  Yet equity and good conscience dictate that the plaintiffs

be permitted to have their day in court with each sovereign.

The Court is also unpersuaded by the government's assertion that the Court should dismiss the quiet title action because plaintiffs might be able to bring an inverse condemnation action. To succeed on an inverse condemnation claim, plaintiffs would have to prove that the government took *their* property. *See generally KLK, Inc. v. United States Dept. of Interior*, 35 F.3d 454, 455 n.1 (9th Cir. 1994) ("Inverse condemnation is a cause of action by which a landowner recovers just compensation from the government for a taking *of his or her property* when condemnation proceedings have not been instituted.") (emphasis added; citation omitted). The State of Idaho claims an interest in the same property, so it appears that plaintiffs would run into the same joinder problems they already face if they chose to pursue an inverse condemnation claim.

For these reasons, the Court finds that the fourth factor – availability of an adequate remedy – weighs against dismissing the quiet-title claim.

**b) Prejudice & The Extent to Which Prejudice Could Be Avoided**

The next factors are the first and second listed above: (1) prejudice; and (2) the extent to which any prejudice can be lessened or avoided.

Turning first to prejudice to the absent party, the State of Idaho is aware the underlying dispute and is almost surely aware of this federal action, yet it has chosen not to intervene. Under Ninth Circuit precedent, this alone is probably sufficient to prevent dismissal under Rule 19. *See United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999) (because the absent party "was aware of this action and chose not to claim an interest . . . the district court did not err by holding that joinder was unnecessary."). Moreover,

plaintiffs have clarified that "if the Court is concerned about prejudicing the State, then the Court can fashion a remedy quieting title to the contested portions of Grays Lake only as between Beavertail & GLLC, on the one hand, and the Government, on the other." *Reply,* Dkt. 63, at 6. Under these circumstances, the Court is not convinced that prejudice to the State of Idaho warrants dismissal under Rule 19(b).

As for prejudice to the United States, the Court has previously explained that if it "were to resolve the title claim to a portion of the lakebed in the State's absence, the United States could be 'subject[ed] to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the [State's] interest." *Order,* Dkt. 54, at 25-26. As plaintiffs have pointed out, however, the State of Idaho has consented to the federal government's use of Grays Lake as a storage reservoir and refuge, notwithstanding various landowners' competing claims of ownership. The State gave this consent in 2014, when it agreed that the United States would "acquire the interest, if any, of the land owners, and the State will consent to the United States' use of the lakebed for a storage reservoir and a refuge." *Letter from Clive Strong*, Dkt. 42-8 at 1. So although the government is technically in a position where it might have to pay competing owners to use the same land, the more serious, practical risk is that the federal government would be forced to obtain consent from competing owners to use the same land. *See Order,* Dkt. 54, at 25-26.

Although this prejudice supports the Court's earlier conclusion that the State of Idaho is a "required" party under Rule 19(a)(1), in considering the issue under Rule 19(b), the Court is not convinced that this prejudice warrants dismissal. Most

significantly, in asking for a Rule 19(b) dismissal, the federal government is not focusing

on the fact that it might have to pay the plaintiffs; rather it claims that the prejudice arises

from the fact that the State of Idaho *might* withdraw its consent to the federal

government's usage of the lakebed as a wildlife refuge and water storage facility if the

United States fails to strike a land-purchase deal with the ranchers.[3]  *See Response,* Dkt.

61, at 6 (in asserting prejudice, the United States says "it is unclear what the State's

position will be if the Government is unable to acquire the Plaintiffs' claimed property

interests . . . .").

But this risk is tempered by various factors.

First, the risk that the State of Idaho might not consent to the federal government's

usage of the lakebed if the United States is unable to negotiate a deal with all landowners

has been there all along; it is factored into the deal between Idaho and the United States.

Second, assuming plaintiffs were to prevail in this action, and further assuming the

Court were to order the government to pay just compensation for retaining possession

and control of the disputed property, *see* 28 U.S.C. § 2409a(b), then the United States has

a good argument that the State remains obligated to allow the federal government to

continue using the lakebed free of charge in accordance with the terms of the 2014

---

[3] The government also worries about what might happen if it is no longer able to use the lakebed, *see Response,* Dkt. 61, at 6, but this does not seem to be a serious concern, as the government later states that "as a practical matter, even if Plaintiffs win their quiet title claim against the Government, the Government will not be required to vacate the property under the Quiet Title Act."  *See id.* at 9 (discussing 28 U.S.C. § 2409a(b) (providing that if the United States loses a quiet title action, it "nevertheless may retain such possession or control of the real property or any part thereof as it may elect, upon payment to the person determined to be entitled thereto . . . .")).

agreement.  After all, one of the stated purposes of that agreement was to "ensure. . . that the United States has permission for the use of the lake bed from the two potential owners [i.e., the State and the upland landowners.]"  Dkt. 42-8, at 1.

Third, and backing away from the facts of this case for a moment, the Eleventh Amendment does not prevent the United States from suing a State in federal court.  *See generally* 28 U.S.C. § 1251(b) ("The Supreme Court shall have original but not exclusive jurisdiction of . . . (2) All controversies between the United States and a State").  The Eleventh-Amendment bar applies to private citizens – not to the United States.  *Bethel Native Corp. v. Dep't of Interior*, 208 F.3d 1171, 1173 (9th Cir. 2000) ("Eleventh Amendment immunity does not, however, extend to actions brought by the United States in federal court."); *United States v. California*, 655 F.2d 914, 918 (9th Cir.1980) ("The federal government ... may sue a state in federal court under any valid cause of action, state or federal, even if the state attempts to limit the cause of action to suits in state courts only.").  So if the United States wished to include the State of Idaho in a quiet title litigation, it has the power to bring Idaho into federal court.  Yet here, Idaho and the United States have agreed not to litigate title.  The upshot is that at the same time the United States is urging this Court to dismiss plaintiffs' quiet title action, the United States has agreed to refrain from litigating title with the State of Idaho.  This sort of maneuvering supports plaintiffs' concerns that they might "end up like Joseph K, the protagonist of Kafka's novel *The Trial,* roaming the halls of government in an effort to find his fate."  *Motion Memo*, Dkt. 59-1, at 10 (citing *Mocanu v. Mueller*, Nos. 07-0445, 07-0971, 07-1482, 2007 WL 4570758, at *1 (E.D. Pa. Dec. 21, 2007).

For all these reasons, the Court concludes that any prejudice to the United States is not sufficient to warrant dismissal under Rule 19(b). *See generally Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 360 (2d Cir. 2015) ("Rule 19 is about protecting absent persons from unfair prejudice – it is not about giving a named defendant veto power over the plaintiff's chosen forum."). Additionally, as already noted, the plaintiffs have stated that they are amenable to a remedy that would "quiet[] title to the contested portion of Grays Lake only as between Beavertail and GLLC, on the one hand, and the Government, on the other." *Reply*, Dkt. 63, at 6 (footnote omitted). The parties have excellent counsel, so it stands to reason that, with their help, the Court will be able to fashion an appropriate judgment.

### c) **Adequacy of Judgment**

The final Rule 19(b) factor is "whether a judgment rendered without the absent party would be *adequate*; . . . ." Fed. R. Civ. P. 19(b) (emphasis added). The Supreme Court has explained that in the context of Rule 19(b), "adequacy" is not focused on the parties themselves, but on the "'public stake in settling disputes by wholes, whenever possible, for clearly the plaintiff who himself chose both the forum and the parties defendant, will not be heard to complain about the sufficiency of the relief obtainable against them." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968) (quoted approvingly in *Republic of Philippines v. Pimentel*, 553 U.S. 851, 870 (2008)).

Initially, this factor would appear to weigh in favor of dismissal because any judgment rendered here will not resolve the title dispute between all parties claiming an

interest in the lands.  In other words, proceeding with this quiet title litigation necessarily means proceeding by halves.  But the Supreme Court instructed that courts should proceed "by wholes, *whenever possible*."  *Id.* (emphasis added).  And as already explained, plaintiffs do not have the power to force a whole resolution in this lawsuit. They do not have the power to force the State into this action.

Further, the government's arguments on this factor do not focus on the broader public stake in resolving disputes by wholes.  Instead, the government focuses on the parties themselves, saying that any judgment rendered here will be insufficient because (1) "it could not grant the relief Plaintiffs seek" and (2) it "could not determine whether the Government could continue to possess the land, based on its agreement with the State."  *Response,* Dkt. 61, at 7.  The Court discussed these issues above, in discussing prejudice.

After having considered this factor, along with the other factors listed above, the Court concludes that equity and good conscience dictate that plaintiffs be permitted to proceed with their quiet title action, notwithstanding Idaho's absence.

## B.     Adjacent Landowners

This Court previously rejected the government's argument that other landowners holding property adjacent to Grays Lake are "required parties" under Rule 19(a).  The government has not formally asked the Court to reconsider this ruling, but in responding to the plaintiffs' motion, the government again argues that these adjacent landowners are "required parties."

The government is concerned that in earlier briefing it may have "failed to

adequately explain that the Court will be asked to decide how Grays Lake should be

divided, if the quiet Title Act claim proceeds . . . ." *Response,* Dkt. 61, at 10.  The

government goes on to say – for the first time – that the lakebed should be divided by the

"Long Lake Method," rather than the "Round Lake Method." *Id.*  at 10-11.  The

government offers the following diagrams to illustrate the difference between the two

methods:

**Round Lake Method**                    **Long Lake Method**

 

The Long Lake Method is unfavorable to owners such as Beavertail and Grays Lake

because their properties border the short end of the lake.

Plaintiffs are justifiably frustrated with the government's new argument.  *See*

*Reply,* Dkt. 63, at 6-8.  The government had every opportunity to make this precise

argument earlier.  Throughout the course of this litigation, the plaintiffs have made it

eminently clear that they believed the lakebed would be divided into pie slices (*i.e.*, via

the Round Lake Method).  Among other things, plaintiffs' complaint alleges that the

ranchers own "a portion of Grays Lake extending from the uplands *to the center of the*

*lake*." *Am. Compl.*, Dkt. 39 ¶¶ 5, 48 (emphasis added).  Additionally, in defending the

government's motion to dismiss under Rule 19, plaintiffs submitted a private ownership map showing pie-sliced-shaped parcels of lakebed property. *See Grays Lake Private Ownership Map*, Dkt. 27-9. The plaintiffs also explicitly argued that certain other landowners were not "required parties" in this litigation because the pie slices claimed by those landowners did not even border plaintiffs' claimed slices. *See Response,* Dkt. 48, at 20 ("The map shows that the properties [of certain adjacent landowners] are not even adjacent to those of Beavertail and GLLC, thus making the Government's argument even harder to fathom.").

In the face of these specific allegations and arguments, the government inexplicably did not say a word about its preference for the Long Lake Method, nor did it explain that different methods of dividing ownership might impact property owners differently.[4] Additionally, plaintiffs report that the government has been able to purchase other landowners' lakebed parcels without difficulty, and that it is only now, "faced with litigation, that the Government has adopted a new tack and argues, for the first time, to our knowledge, that Grays Lake could be divided in a variety of manners and the 'Long Lake Method' is the most appropriate." *Id.* at 8.

Under these circumstances, the Court is not inclined to reconsider its prior ruling regarding adjacent landowners at this time.

---

[4] In supporting its motion to dismiss, government made an oblique, passing reference to the fact that "determining the method by which the lakebed will be divided will affect the non-party landowners' proportions" in its briefing, *see Reply*, Dkt. 50, at 9. But it failed to meaningfully expand on this point by, for example, explaining that there were competing methods or saying that it preferred a method different from the ones plaintiffs were using.

## C.    The Tort Claim

The next issue relates to plaintiffs' tort claims.  The Court previously denied the government's motion to dismiss the tort claims.  The government had argued that tort claims were barred by the discretionary function exception to waiver of immunity found within the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680.  The Court was not persuaded, concluding that the government's decision to stop construction on the perimeter dike at Grays Lake "was a failure to effectuate a policy decision already made, or a decision to stop due to technical reasons, rather than a policy-based decision that designed a governmental course of action." *Aug. 29, 2017 Order*, Dkt. 54, at 16.

The parties also disputed a related, threshold issue – whether the government was contractually required to build the dike in the first place (thus removing its discretion *not* to build the dike).  The Court rejected the plaintiffs' argument that the government obligated itself to build a perimeter dike when it entered into the 1965 Cooperative Use Agreements with various ranchers.  *See id.* at 10.  But the Court questioned whether the government obligated itself to build a dike in a different agreement – a 1964 Memorandum of Understanding between two Department of Interior agencies.  *See id.* at 10-11 (discussing the 1964 Memorandum of Understanding between BIA and Fish & Wildlife, which is filed at Dkt. 23-4.)  Because the parties had not briefed issues arising from this earlier agreement, the Court refrained from ruling but invited plaintiffs to move for reconsideration if they wished to obtain a ruling on that narrow issue.  Dkt. 54. at 13. Plaintiffs now ask for that ruling.  For the reasons explained below, the Court concludes that the 1964 agreement obligated the government to build the dike as funds became

available.

**1. Governing Legal Principles**

Before delving into the terms of the 1964 agreement, the Court will set out the broader legal principles. The starting point is the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-80. This Act waives sovereign immunity, allowing tort claims to be brought against the United States arising out of the negligent conduct of government agents acting within the scope of their discretion. *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998). Thus, the United States may be held liable "to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

Congress has carved out several exceptions to the FTCA's waiver of immunity. *See* 28 U.S.C. § 2680. One of those exceptions is the discretionary function exception, which provides that the FTCA's waiver of sovereign immunity does not extend to:

> Any claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

 "The discretionary function exception is meant to avoid judicial second-guessing of governmental decisions. It is not, however, intended to create inconsistent liabilities between private and government employees performing identical acts. Thus, 'in cases where the government is alleged to have committed negligence in the performance of a function such as that performed by a private citizen, rather than in the fulfillment of a broad policy-making duty, the government is subject to suit.'" *Bear Medicine v. United*

*States,* 241 F.3d 1208, 1214 (9th Cir. 2001) (quoting *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995)).

The applicability of the discretionary function exception is determined by a two-part test, sometimes referred to as the *Berkovitz* analysis. *See generally Berkovitz v. United States*, 486 U.S. 531, 536 (1995). First, the exception covers acts that are *discretionary*, so the challenged action must be "a matter of choice for the acting employee." *Id.* The choice requirement is not satisfied where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because in that case, "the employee has no rightful option but to adhere to the directive." *Id.*

Second, if discretion is involved, there must also be a finding that the discretion involves the type of judgment the discretionary function was designed to shield. *Id.* The exception is designed to shield actions and decisions based on social, economic, or political policy. *Id.* The decisions need not actually be grounded in policy considerations, but must, by their nature, be susceptible to a policy analysis. *United States v. Gaubert*, 499 U.S. 315, 325 (1991). The Court previously decided that the plaintiffs prevailed at step two of the *Berkovitz* analysis. *See* Dkt. 54, at 13-19.

## 2. The 1964 Agreement is Sufficiently Specific to Obligate the Government at Step One of the *Berkovitz* Analysis

The question at issue here relates to the first step of the *Berkovitz* analysis: whether the government deviated from a required duty. The more specific question is whether the 1964 agreement between the BIA and Fish & Wildlife removed the

government's discretion *not* to build a dike. There, the parties agreed that "The Bureau of

Sports Fisheries and Wildlife will, as funds become available, construct dikes, roads,

canals, control structures, fences and operation headquarters[.]" *Memorandum of*

*Understanding (MOU),* Dkt. 23-4, ¶ 2.  In the following paragraph, the agreement

specifically refers to an impervious perimeter diking system. *Id.* ¶ 3.

Several courts, including the Ninth Circuit, have recognized that if the

government voluntarily assumes a contractual obligation, that obligation may impose

nondiscretionary duties on government employees.[5] The government argues that the

1964 agreement does not create any obligation related to dikes because it "fails to

provide terms, specifications or details that would dictate the size, dimensions, location,

numbers and/or construction materials." *Response*, Dkt. 61, at 13.  The Court is not

persuaded.  While the agreement does not provide the level of detail the government

insists upon, it nevertheless prescribes a specific course of action by stating that Fish and

Wildlife will construct dikes as funds become available.  Stated differently, although

Fish & Wildlife retained discretion regarding various construction details, the agreement

nevertheless removed its discretion *whether* to build the dike as funds became available.

The cases cited by the government do not convince the Court that the level of detail

---

[5] *See, e.g., Routh v. United States,* 941 F.2d 853, 855 (9th Cir. 1991) ("discretion may be removed
if the government incorporates specific safety standards in a contract which imposes duties on the
government's agent" (internal quotation omitted)); *Bell v. United States,* 127 F.3d 1226, 1230 (10th Cir.
1997) (finding that contract specifications left no discretion); *Kiehn v. United States,* 984 F.2d 1100, 1106
(10th Cir. 1993) (mandatory emergency assistance required by contract and National Park Service
Guidelines); *Feyers v. United States,* 749 F.2d 1222, 1227 n.7 (6th Cir. 1984) (considering whether
contract required specific safety measures).

contained in the 1964 agreement is insufficient. In fact, one of the cases relied upon by the government, *Bailey v. United States*, 623 F.3d 855 (9th Cir. 2010), supports the Court's conclusion that the 1964 agreement created a mandatory obligation, thereby removing the government's discretion.

In *Bailey*, Joseph Bailey drowned after rowing his boat over a submerged dam on the Yuba River in Northern California. *Id.* at 858. The Army Corps of Engineers had placed warning signs upstream, but the signs were not there when Mr. Bailey rowed by; recent heavy flooding had washed the signs away. *Id.* Four days before Bailey drowned, the Corps tried to replace the signs but decided the turbulent river made it too unsafe to complete the task. *Id.* Mr. Bailey's widow and children sued, claiming that the Corps negligently failed to replace the warning signs.

The Army Corps' "Sign Standards Manual" obligated it to replace missing signs "in a timely manner," *id.,* but "no regulation or guideline required the Corps to replace the missing signs before a busy weekend or within a specific period of time after receiving notice that the signs were gone." *Id.* at 861. The Ninth Circuit held that this provision did indeed "strip the Corps of its discretion *whether* to replace missing or damaged signs," but did not "create a mandatory and specific directive regarding *when* the Corps must replace any missing or damaged signs. Rather, the determination of when to replace the signs is left to the discretion of the Corps." *Id.* Because the plaintiffs' theory relied upon their assertion that the Corps should have replaced the signs within a specific time period, their claim was barred by the discretionary function exception.

Here, under *Bailey*'s logic, the government may argue that it was not obligated to

use particular construction materials or methods, or that there was not a precise time within which it had to build dikes, but it cannot successfully argue that the agreement left it discretion to *never* build the dikes. As already noted, paragraph 2 of the agreement obligated Fish & Wildlife to construct dikes as funds became available.

The government also sidesteps paragraph 3 of the agreement, which provides additional detail regarding the perimeter diking system:

> Water levels may be manipulated at elevations above or below the 6386.0 m.s.l. elevation in one or more of the managed pools by conveyance of water from one managed pool to another as may be required to effectively develop, operate, and maintain the specified Refuge Area for migratory birds and other wildlife; *PROVIDED, HOWEVER, that the Bureau of Sport Fisheries and Wildlife Refuge Area perimeter diking system is to be impervious.*

1964 Agreement, Dkt. 23-4, ¶ 3. The government says the italicized language "does not remove the Government's discretion because it does not evidence any agreement to an affirmative obligation by FWS." *Response*, Dkt. 61, at 14 n.8. Rather, the government asserts that this language "merely limits BIA's obligations if FWS does not construct an impervious perimeter diking system." *Id.* This is one potential reading, but the clause is more logically viewed as reinforcing Fish & Wildlife's obligation to construct a perimeter dike.

The government also makes a passing, parenthetical suggestion that enforcing a contract between the BIA and Fish & Wildlife "is a dubious proposition considering both are agencies within the Department of the Interior." *Response,* Dkt. 61, at 13. The government does not cite any authority supporting this assertion, nor does it expand on the point. The Court is not persuaded by this undeveloped, unsupported argument and

will assume that the contract at issue may indeed create mandatory duties under the FTCA. *Cf. Downs v. United States*, No. 06-20861, 2007 WL 842136, at *7 (S.D. Fla. Mar. 20, 2007) (rejecting the government's argument that an agreement between the Army Corps and Dade County, Florida was not the sort of contract that could establish mandatory duties under the FTCA), *rev'd on other grounds,* 333 Fed. Appx. 403 (11th Cir. 2009) (unpublished decision).

The government next argues that two conditions precedent to its obligation to build the dike were never satisfied, thus removing its obligation to do so.

First, the government says that BIA and Fish and Wildlife never agreed upon any plans or specifications that would govern construction. The government does not cite any evidence supporting this assertion aside from the following language contained in paragraph 2 of the agreement:

> The Bureau of Sport Fisheries and Wildlife will, as funds become available, construct dikes, roads, canals, control structures, fences and operational headquarters; and will remove, to the extent it is feasible and economic, the dense mats of emergent vegetation within the Refuge Area *in accordance with plans and specifications mutually agreed upon by the two Bureaus*.

Dkt. 23-4 ¶ 2 (emphasis added).

The most obvious problem with this argument is that the italicized language modifies the second clause of the sentence – the one about removing dense and emergent vegetation – not the first. The government acknowledges this point, but nevertheless insists that "a common sense reading of the paragraph suggests that the italicized language modifies both clauses." *Response*, Dkt. 61, at 14. The Court disagrees; as drafted, the clause modifies only the second clause, and the government has not

convinced the Court to interpret the clause otherwise.

Further, even assuming the italicized language modified both clauses, the Court does not have sufficient evidence before it to conclude either (1) that the parties had not agreed upon plans and specifications for the perimeter dike at the time they entered into the agreement, or (2) that they did not later agree upon plans and specifications. The language does not say in accordance with plans and specifications *to be* agreed upon; it says "in accordance with plans and specifications mutually agreed upon by the two Bureaus." *MOU*, Dkt. 23-4, ¶ 2. That language leaves room to conclude that the parties had already agreed upon plans and specifications. Further, regardless of how this clause is interpreted, the government did start building a dike, which would suggest that the parties had formulated a plan of some sort.

As for the second pre-condition, the government focuses on the portion of the agreement stating that Fish and Wildlife would construct dikes and other structures "*as funds become available*." *Id* (emphasis added). The government begins its argument by characterizing the agreement as follows: "FWS agreed with BIA only to construct such structures '*to the extent funds become available.*'" *Response*, Dkt. 61, at 14 (emphasis added). But the agreement does not say "to the extent funds become available"; it says "as funds become available." *Id*. The difference is subtle but, still, the language of the agreement is more favorable to the plaintiffs than the government suggests. Further, the government does not point to any evidence supporting its assertion that funds were never made available. Additionally, to the extent the government suggests that Fish & Wildlife's promise was illusory because it could avoid any obligation to construct dikes

by unilaterally deciding not to fund the project regardless of whether funds became available, the illusory-promises doctrine instructs courts "to avoid construction of contracts that would render promises illusory because such promises cannot serve as consideration for a contract." *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 936 (2015) (citing 3 R. Lord, *Williston on Contracts* § 7:7 (4th ed. 2008)).

### 3. The 2008 BIA Regulation Does Not Restore Discretion

Finally, the government's reliance on a regulation, promulgated in 2008, stating that a different government agency – the Bureau of Indian Affairs – "may build, operate, maintain, rehabilitate or remove structures . . . on our irrigation projects," 25 C.F.R. 171.400, misses the mark. In 1964, Fish & Wildlife obligated itself to construct dikes as funds were made available. That agency cannot sidestep its obligation by pointing to a later regulation stating that a different agency may build or remove structures on its irrigation projects.

For all these reasons, the Court will reconsider its earlier conclusion that the government has prevailed at step one of the *Berkovitz* analysis. Based on the reasoning set forth above, the Court concludes that the plaintiffs have prevailed at this step as well.

### ORDER

**IT IS ORDERD THAT:**

1. Plaintiffs' Motion for Reconsideration (Dkt. 59) is **GRANTED.**

2. The United States shall file its answer to plaintiffs' Amended Complaint within 21 days of this Order.



DATED: January 25, 2018

B. Lynn Winmill
Chief U.S. District Court Judge